IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1:19-cv-01268-DME-NRN

**PARK RISE HOMEOWNERS ASSOCIATION, INC.**,
a Colorado nonprofit corporation,

    Plaintiff,

v.

**HDI GLOBAL SPECIALTY SE** *f/k/a* **INTERNATIONAL INSURANCE COMPANY OF HANNOVER SE**,
a foreign corporation,

    Defendant.

### FIRST AMENDED COMPLAINT

COMES NOW Park Rise Homeowners Association, Inc. ("Park Rise"), through counsel, MoGo LLC, and for its First Amended Complaint against the HDI Global Specialty SE *f/k/a* International Insurance Company of Hannover SE ("HDI") states as follows:

### I.   NATURE OF THE ACTION

1. Park Rise is a homeowner's association that owns and operates an eleven (11) building condominium complex that was damaged by hail in a notoriously severe hail storm occurring on May 8, 2017, affecting several regions throughout Colorado. When HDI estimated Park Rise's loss, it concluded that the amount of loss totaled $202,657.47, which is less than the policy's deductible of $350,980.00. Based on that conclusion, HDI did not issue a payment on the claim. After filing suit and proceeding through an appraisal process, Park Rise's loss has been valued at $1,566,990.46. This action was administratively closed during the pendency of the

appraisal process and reopened upon completion. HDI now refuses to authorize payment for the full value of the appraisal award due to an unreasonable interpretation of the Policy. In reopening this action, Park Rise seeks damages for breach of contract and damages pursuant to C.R.S. § 10-3-1116(1).

## II.   PARTIES

2.   Park Rise is a Colorado nonprofit corporation principally located in the State of Colorado.

3.   HDI is a foreign insurance company with its principal place of business located in London, United Kingdom. HDI is authorized to do business in Colorado as a surplus line of coverage under the Nonadmitted Insurance Act of Colorado.

4.   Pursuant to the "Service of Suit Clause" in Policy No. IHAB10175 ("the Policy"), HDI will submit to the jurisdiction of a court of competent jurisdiction within the United States and will abide by the final decision of such court or any appellate court in the event of an appeal.

## III.   JURISDICTION AND VENUE

5.   Jurisdiction is asserted pursuant to 28 U.S.C. § 1332. The amount in controversy exceeds $75,000.00, and there is complete diversity of citizenship between the parties. Venue is proper under 28 U.S.C. § 1391 because the insurance policy was purchased in Colorado and was intended to provide coverage for a property located in Colorado.

## IV.   GENERAL ALLEGATIONS

6.   The Policy covers Park Rise's condominium complex located at 2416 through 2436 W. 82nd Place, Westminster, Colorado 80031 (the "Property").

7.   An authentic copy of the Policy is attached hereto as Exhibit 1.

8. On or about May 8, 2017, the Property was damaged in a hail storm.

9. No hail storm has damaged the Property since May 8, 2017.

10. Sometime thereafter, Park Rise reported its claim to HDI which was assigned claim no. 08-012650.

11. On or about May 7, 2018, HDI assigned William Cardenas of Premier Claims Management, LLC ("Premier") to adjust the loss.

12. At all relevant times, William Cardenas and Premier acted as agents of HDI.

13. Barbara Bourgeois was to act as the claim supervisor for Premier to adjust the loss.

14. At all relevant times, Barbara Bourgeois acted as an agent of HDI.

15. On May 8, 2018, Mr. Cardenas emailed Park Rise's property manager, Jennifer Gill requesting information regarding the loss.

16. On May 9, 2018, Ms. Gill provided Mr. Cardenas a Hail Damage Report from Lincoln Hancock Restoration ("Hancock").

17. In the same email, Ms. Gill requested that Mr. Cardenas contact her if he needed any additional information.

18. Hancock's report was based upon an on-site study of the Property's exteriors by Chad Whisenhunt between April 20, 2018 and May 1, 2018.

19. Hancock's report found hail damage to the roofing system to the extent that the roofing system integrity was compromised due to missing granules leaving a bruised mat exposed to the sun which allows water to freely flow through resulting cracks, resulting in interior water damage.

20. Hancock's report observed more than eleven hits per square on most slopes.

21. Hancock's report observed damage to skylights, windows, screens, HVAC units and soft metals, including vents, gutters, and downspouts.

22. Hancock's report concluded that there was enough damage to the roof to warrant a complete roof replacement.

23. Hancock's report determined that the damaged skylights, windows, screens, HVAC units and soft metals sustained enough damage to warrant repair and/or replacement.

24. In the same May 9, 2018 correspondence, Ms. Gill provided hail damage photos from LR Contracting and hail damage photos from Valor Roof and Solar.

25. On June 7, 2018, Ms. Gill, having heard nothing yet from HDI regarding the claim, requested an update from Mr. Cardenas and asked if he needed any "additional information."

26. Sometime in May or June 2018, HDI hired Jon Asp of Cunningham Lindsey to act as an independent adjuster on HDI's behalf.

27. At all relevant times, Jon Asp and Cunningham Lindsey acted as agents of HDI.

28. On June 20, 2018, Mr. Asp contacted Ms. Gill requesting a time to inspect the hail damage to the Property.

29. On June 25, 2018, Ms. Gill confirmed that Mr. Asp was the adjuster for both the hail and a separate water loss.

30. In the same communication Ms. Gill asked for dates Mr. Asp was available to inspect the Property and if he needed more information.

31. On or about July 6, 2018, Mr. Asp inspected the Property with EIS Colorado Inc. ("EIS") – a contractor hired by Park Rise to conduct repairs to the Property.

32. On that date, Mr. Asp only had time to inspect three main buildings and told Michael Gochenour of EIS that he would ask HDI if they needed him to inspect all buildings.

33. On that date, Mr. Asp communicated to Mr. Gochenour that if HDI wanted a full inspection, he would contact EIS or Park Rise to schedule another inspection.

34. On that date, Mr. Asp further communicated to Mr. Gochenour that if HDI did not need a full inspection, he would write up the roofs and EIS or Park Rise could submit pictures for all of the other damage.

35. Upon information and belief, Mr. Asp did not conduct another inspection.

36. Upon information and belief, Mr. Asp only inspected one of the eleven buildings based on drone footage showing chalk marks on only one of the roofs, collected by EIS.

37. On July 10, 2018, Mr. Gochenour followed up with Mr. Asp who noted that he had not heard back from Defendant.

38. As of the initial filing of this action in May 2019, HDI had not produced an estimate of damages from the May 8, 2017 hail storm.

39. Sometime in October of 2018, Park Rise signed an Assignment of Claim assigning its post loss rights regarding the claim to EIS so EIS could handle the claim directly with HDI.

40. On January 18, 2019, Ms. Gill sent Mr. Cardenas an email requesting an update since their last conversation in November or December in which a pending estimate was discussed.

41. Upon information and belief, Mr. Cardenas never responded.

42. On January 21, 2019, Ms. Gill requested an update from Jon Asp regarding the claim.

43. Mr. Asp responded that an engineer had been sent out and provided a recommendation based on his findings.

44. Mr. Asp also noted in the same correspondence that an estimate was completed and sent to HDI.

45. On January 21, 2019, Ms. Gill requested a copy of the engineering report and estimate.

46. As of the filing of this action, neither the estimate nor the engineering report created for HDI had been produced to Park Rise.

47. On January 22, 2019, Mr. Asp told Ms. Gill that his file had closed on his end on December 17, 2018 and requested that she reach out to Premier and included Mr. Cardenas's contact information.

48. Mr. Cardenas had been contacted multiple times by EIS and Park Rise with no response.

49. On January 29, 2019, Mr. Tom Sedwick of EIS emailed Mr. Cardenas requesting a copy of the engineering report and estimate to review.

50. On February 1, 2019, Mr. Sedwick emailed Mr. Cardenas requesting that he confirm receipt of the previous email on the 29th of January which included EIS's Assignment of Claim.

51. In the same email, Mr. Sedwick again requested that Mr. Cardenas send a copy of the purported engineering report and estimate.

52. As of the initial filing of this action in May 2019, neither the estimate nor the engineering report created for HDI had been produced to EIS or Park Rise.

53. On February 6, 2019, Mr. Cardenas told Mr. Sedwick that only approximately $200,000.00 had been approved so far in repairs and that he would get EIS the purported engineering report and estimate as soon as HDI approved release.

54. On February 14, 2019, Mr. Sedwick emailed Mr. Cardenas yet again requesting Defendant's estimate of damage and the engineering report Defendant relied on.

55. Mr. Cardenas replied to Mr. Sedwick's email on February 14, 2019 noting: (1) that EFI Engineering was the engineering firm that created the engineering report; (2) that Premier was preparing to send a letter stating that the deductible is higher than the total pay-out essentially denying the claim; and (3) the biggest issue will be the law and ordinance coverage.

56. On February 18, 2019, Matt Zimmerman of EIS provided Mr. Cardenas a copy of EIS's Xactimate, subcontractor bids and estimates, as well as applicable code language collected by EIS.

57. EIS's Xactimate assessed $1,649,144.62 in damage caused by the May 8, 2017 date of loss which would include the roof replacement recommended by Lincoln Hancock in May of 2018.

58. As of the initial filing of this action, EIS's Xactimate was the only estimate of damages the Park Rise had received since the claim was filed in May of 2018.

59. EIS's investigation of the loss determined that the roofs of the Property needed to be replaced pursuant to Westminster building codes which were included in EIS's submission of its Xactimate estimate.

60. During EIS's investigation of the loss, it determined that HDI may have only inspected one building rather than all eleven buildings because it found chalk marks identifying hail impacts on only one building.

61. On March 6, 2019, Mr. Cardenas confirmed that he had received the documents sent by EIS on February 18, 2019.

62. That same day, Mr. Sedwick submitted the same documentation to Mr. Asp to move the claim forward.

63. On or about March 13, 2019, Barbera Bourgeois, Mr. Cardenas' supervisor, took over the claim because Mr. Cardenas was no longer with Premier.

64. On or about March 14, 2019, Ms. Gill contacted Ms. Bourgeois for an update and to submit another request for the engineering report and estimate.

65. That same day, Mr. Sedwick spoke with Mr. Asp regarding the claim and Mr. Asp indicated that he was unaware that Mr. Cardenas was no longer with Premier.

66. On March 19, 2019, Mr. Sedwick requested a tolling agreement from Defendant to which Mr. Sedwick received no response.

67. On March 21, 2019, Mr. Sedwick sent an email which stated that: (1) he and Ms. Gill had attempted to call Ms. Bourgeois multiple times with no answer even though Ms. Bourgeois said she would get back to them within 48 hours the previous Monday; (2) he again requested the engineering report and estimate HDI relied on; (3) he wanted an update on his request for a tolling agreement; and (4) he wanted confirmation that the documentation EIS submitted on February 18, 2019 had been received.

68. That same day, Ms. Bourgeois and Mr. Sedwick had a telephone conversation regarding the claim.

69. In a different email on the same date, Mr. Sedwick memorialized their conversation and also requested Ms. Bourgeois confirm that: (1) she was now the claims handler; (2) that Jon Asp was still the independent adjuster; (3) that she has received EIS's claim assignment allowing them access to information; and (4) she would request HDI provide EIS and Park Rise with the engineering report and estimate.

70. In a separate email on the same date, Mr. Sedwick requested confirmation that he and Ms. Bourgeois communicated about the same property because she had mentioned numerous things that did not correspond to Park Rise's property.

71. In addition, in the same email, Mr. Sedwick requested written documentation confirming Ms. Bourgeois's assertion that the Westminster Building Department does not require the full replacement of the roofs due to the building code requirements and stated that such documentation would be in direct conflict with the written documents that have been provided to HDI.

72. On April 5, 2019, after receiving no word from Ms. Bourgeois regarding the claim, Mr. Sedwick sent another follow up email stating that: (1) he had asked multiple times if HDI needed any further clarification; and (2) she had failed to respond or otherwise answer any of EIS's questions.

73. On April 11, 2019, Mr. Sedwick and Mr. Asp had a telephone conversation in which Mr. Asp, apparently agreeing with EIS, notified Mr. Sedwick that he had sent an email to Premier explaining that Westminster Code requires replacement of the Property's roofs.

9

74. On April 29, 2019, since it was unable to make any additional progress with Defendant, EIS released its rights under its Assignment of Claim back to Park Rise and terminated the Assignments of Claim signed in October of 2018 and March of 2019.

75. As of the filing of this action, neither Park Rise nor EIS had been provided any rational basis as to why Park Rise had not received any payment on this claim.

76. As of the filing of this action, neither Park Rise nor EIS had received any of the requested documents that would explain Defendant's failure to replace the Property's roofs.

77. As of the filing of this action, Defendant had not provided Park Rise or its contractor any documentation or information to rebut EIS's estimate of damages.

78. Defendant's only basis for non-payment of any benefit was that the damage evaluated by its engineer and independent adjuster was below Park Rise's deductible.

79. Defendant had failed to provide any documentation to support its insistence that the damage identified was less than the Policy deductible.

80. Park Rise was entitled to the documentation HDI used to evaluate Park Rise's claim.

81. HDI knew Defendant was entitled to such documentation such as the engineering report and estimate but withheld such information to prevent the claim from moving forward.

82. HDI only investigated one building rather than all eleven buildings.

83. HDI's investigation was unreasonable and the insurer knew so.

84. After the filing of this action, Defendant invoked the Policy's appraisal provision.

85. On October 14, 2020, in accordance with the Policy, Park Rise's appraiser and the appraisal umpire reached an agreement that the amount of Park Rise's May 8, 2017 hail loss was $1,566,990.46, and documented their agreement in an "Appraisal Award."

86. The Appraisal Award corresponds to an Xactimate estimate ("Appraisal Estimate"), which breaks down the amount of loss into discrete line items.

87. The Appraisal Estimate called for full roof replacement to each of the Property's eleven condominium buildings for a cost of $1,051,049.60.

88. In an itemized repair estimate dated December 17, 2018, Defendant estimated the cost to repair the hail damage to the Property's eleven condominium buildings' roofs at $147,777.48.

89. On November 13, 2020, Defendant issued a check for $676,206.00 to Park Rise.

90. In a letter dated November 16, 2020, Defendant's attorney explained the payment as follows:

> "Pursuant to the terms of your client's policy with HDI Global Specialty SE ("HDI"), the applicable policy limit for the subject property damage is $1,000,000.00. Your client's deductible is $350,980.00 which is based on the 2% Total Insurable Value ("TIV") of the property. Thus, the maximum payment under the policy is $649,020.00. After applying depreciation to the umpire's award, HDI determined the actual cash value ("ACV") of the claim to be $676,206.00. This amount is greater than the amount HDI is required to pay under the policy after application of the deductible. However, HDI is issuing payment for the full ACV amount. Per your instructions on November 6, 2020, please find a check made payable to Mogo, LLC in the amount of $676,206.00 enclosed."

91. An authentic copy of Defendant's November 16, 2020 letter is attached hereto as Exhibit 2.

92. The Policy's limit of insurance is $17,549,000.00

93. The Policy states the following with respect to application of the deductible:

"2. We will not pay for loss or damage until the amount of loss exceeds the applicable Deductible. We will then pay the amount of loss or damage in excess of that Deductible, up to the applicable Limit of Insurance, after any reduction required by any of the following: Coinsurance Condition, Agreed Value Optional Coverage, Additional Condition- Need for Adequate Insurance or Additional Condition - Need for Full Reports." [Exhibit 1, p. 71].

## V.  FIRST CLAIM FOR RELIEF
(*Breach of Contract*)

94. Park Rise incorporates the allegations contained in the paragraphs above as if fully set forth herein.

95. The Policy is a contract.

96. Park Rise performed all of its obligations under the contract, or any such nonperformance was waived by HDI.

97. The Policy's limit of insurance is $17,549,000.00

98. The Policy's deductible is 2% of $17,549,000.00, which equals $350,980.00.

99. The Appraisal Award set the amount of loss at $1,566,990.46.

100. The maximum amount of covered benefits available to Park Rise pursuant to the Policy and Appraisal Award is $1,216,010.46 (the Appraisal Award amount less the deductible).

101. However, HDI determined that "the maximum payment under the policy is $649,020.00." [Exhibit 2, p. 1].

102. HDI's payment purports to cover the "actual cash value" of the loss. HDI applied a specious calculation to arrive at the actual cash value amount.

103. As a direct and proximate result of said breach, Park Rise is entitled to damages.

## VI.   SECOND CLAIM FOR RELIEF
*(Violation of C.R.S. § 10-3-1115 and Relief Pursuant to C.R.S. § 10-3-1116)*

104.   Park Rise incorporates the allegations contained in the paragraphs above as if fully set forth herein.

105.   Section 10-3-1115(1)(a), C.R.S., forbids an insurer from unreasonably delaying or denying payment of a claim for benefits owed to any first-party claimant. Section 10-3-1115(2) states: "an insurer's delay or denial was unreasonable if the insurer delayed or denied authorizing payment of a covered benefit without a reasonable basis for that action."

106.   HDI is an entity engaged in the business of insurance.

107.   Park Rise is a first-party claimant within the meaning of C.R.S. § 10-3-1115(1)(b).

108.   Violations of the Unfair Claims Settlement Practices Act, C.R.S. § 10-3-1104(1)(h)(I)-(XIV), are relevant to determining whether an insurer's delay or denial was reasonable for purposes of claims brought under § 10-3-1115 and -1116.

### 1. Unreasonable Delay/Denial: Pre-Appraisal

109.   Under C.R.S. § 10-3-1104(1)(h)(IV), HDI is prohibited from "[r]efusing to pay claims without conducting a reasonable investigation based upon all available information."

110.   HDI did not conduct a reasonable investigation based upon all available information.

111.   HDI ignored pertinent information provided to it, and as a result, grossly underestimated the costs to repair the Property.

112. Under C.R.S. § 10-3-1104(1)(h)(VI), HDI is prohibited from "[n]ot attempting in good faith to effectuate prompt, fair, and equitable settlements of claims in which liability has become reasonably clear."

113. HDI failed to adequately communicate any aspect of its investigation, which caused it to unreasonably deny Park Rise its contractual right to a prompt, fair, and equitable settlement of its claim.

114. Under C.R.S. § 10-3-1104(1)(h)(II), HDI is prohibited from "[f]ailing to acknowledge and act reasonably promptly upon communications with respect to claims arising under insurance policies."

115. HDI failed to adequately communicate or act reasonably or promptly in responding to communications initiated by Park Rise or EIS with respect to this claim.

116. Under C.R.S. § 10-3-1104(1)(h)(XIV), HDI is prohibited from "[f]ailing to promptly provide a reasonable explanation of the basis in the Policy in relation to the facts or applicable law for denial of a claim."

117. HDI failed to provide any reasonable explanation of the basis for its claims decision.

118. HDI failed to provide any documentation which would explain the basis of its claims decision.

119. HDI failed to provide any reasonable basis in the Policy in relation to any fact which would explain the basis of its claims decision.

120. HDI failed to provide any applicable law which would explain the basis of its claims decision.

121. HDI and its agents received all necessary information to properly adjust the loss, account for building code, and otherwise produce a reasonable repair estimate, but HDI failed to do so.

122. A reasonable insurer in HDI's position would have properly estimated the cost to repair the hail damage at the Property, taking into account all pertinent information.

123. HDI's failure to adhere to industry standards delayed the adjustment and eventual authorization of payment for covered insurance benefits and therefore constitutes a violation of C.R.S. § 10-3-1115.

### 2. Unreasonable Delay/Denial: Post-Appraisal

124. As described above, the appraised amount of $1,566,990.46, less the $350,980.00 deductible, leaves a total amount of $1,216,010.46 in covered benefits available under the Policy as a result of the May 8, 2017 hail loss.

125. HDI only authorized payment for $676,206.00, which according to Defendant "is greater than the amount HDI is required to pay under the policy after application of the deductible." [Exhibit 2, p. 1].

126. According to HDI, "the applicable policy limit for the subject property damage is $1,000,000.00." [Exhibit 2, p. 1].

127. The Policy limit is $17,549,000.00.

128. The Policy includes an "Ordinance or Law Coverage" endorsement providing three types of coverage: (1) Coverage A — Coverage For Loss To The Undamaged Portion of The Building; (2) Coverage B — Demolition Cost Coverage; (3) Coverage C — Increased Cost of Construction Coverage. [Exhibit 1, p. 39].

15

129. The Policy's total limit of insurance of $17,549,000.00 applies to Ordinance or Law, Coverage A. [Exhibit 1, p. 38].

130. The Policy contains a sublimit for Ordinance or Law, Coverages B and C, of a combined total of $1,000,000.00. [Exhibit 1, p. 38].

131. Upon information and belief, HDI's position is that the entirety of the appraised amount of loss is due to the enforcement of an ordinance or law subject to the Ordinance or Law Coverage endorsement in the Policy.

132. Under C.R.S. § 10-3-1104(1)(h)(X), HDI is prohibited from "[m]aking claims payments to insureds or beneficiaries not accompanied by a statement setting forth the coverage under which the payments are being made."

133. HDI's letter and payment to Park Rise did not specify the coverage under which the payment was made. [Exhibit 2].

134. It is impossible for the entirety of the appraised amount of loss to be due to an ordinance or law because during its adjustment HDI estimated that the amount of loss, without accounting for the requirements of applicable building codes, totals $202,657.47. That amount was strictly HDI's estimated cost of the damage caused by hail and was not subject to any of the Policy's Ordinance or Law coverages.

135. HDI's interpretation, explanation and payment to Park Rise were unreasonable and HDI knew so.

136. Under C.R.S. § 10-3-1104(1)(h)(I), HDI is prohibited from "[m]isrepresenting pertinent facts or insurance policy provisions relating to coverages at issue."

137. HDI misrepresented provisions of the Policy relating to the deductible's application and the limits of insurance.

138. According to HDI, to arrive at the amount payable on a claim, the Policy deductible is subtracted from the Policy's limit of insurance. [Exhibit 2, p. 1].

139. The Policy unambiguously explains that the deductible is applied to the amount of loss, not to the limit of insurance. [Exhibit 1, p. 71 ("We will not pay for loss or damage until the **amount of loss or damage exceeds the applicable Deductible**. We will then pay the amount of loss or damage in excess of that Deductible, up to the applicable Limit of Insurance …" (bold added)].

140. The amount of loss is $1,566,990.46, as determined through binding appraisal.

141. The amount of loss in excess of the deductible is $1,216,010.46.

142. HDI is required to pay up to the lesser of $1,216,010.46 or the applicable limit of insurance.

143. If the sublimit of insurance for Ordinance or Law, Coverages B and C, applies, then the total amount of payable benefits under the Policy is at least $1,202,657.47.

144. If the sublimit of insurance for Ordinance or Law, Coverages B and C, does not apply, then the total amount of payable benefits under the Policy is $1,216,010.46.

145. HDI only authorized payment for Park Rise's claim for benefits owed under the Appraisal Award in the amount of $676,206.00. [Exhibit 2, p. 1].

146. In doing so, HDI delayed/denied authorizing payment of the remaining $539,804.46 of covered benefits payable under the Policy. Due to the uncertainty HDI injected

into the claim payment process, Park Rise is unable to secure a contractor to perform the repairs to the Property.

147. Under C.R.S. § 10-3-1104(1)(h)(VII), HDI is prohibited from "[c]ompelling insureds to institute litigation to recover amounts due under an insurance policy by offering substantially less than the amounts ultimately recovered in actions brought by such insureds."

148. HDI's denial of payment of Park Rise's claim for benefits due under the Appraisal Award compelled Park Rise to litigate over the interpretation of the Policy, specifically the limit of insurance and its relationship to the deductible.

149. Under C.R.S. § 10-3-1104(1)(h)(XIII), HDI is prohibited from "[f]ailing to promptly settle claims, where liability has become reasonably clear, under one portion of the insurance policy coverage in order to influence settlements under other portions of the insurance policy coverage."

150. Following the Appraisal Award, HDI's liability was reasonably clear.

151. HDI adopted unreasonable positions regarding the Policy's deductible and limit of insurance in order to weaken Park Rise's resolve and to influence Park Rise to settle for amounts less than are owed under the terms of the Policy and Appraisal Award.

152. No reasonable insurer in HDI's position would hold such specious positions. [see Exhibit 2].

153. In failing to approve covered benefits after appraisal, HDI denied authorizing payment of covered benefits to Park Rise without a reasonable basis and therefore violated C.R.S. § 10-3-1115.

154. Park Rise therefore brings this claim to recover its reasonable attorneys' fees and court costs and two times the covered benefits unreasonably delayed and denied, as allowed under C.R.S. §10-3-1116(1).

## VII. PRAYER FOR RELIEF

WHEREFORE, Plaintiff Park Rise Homeowners Association, Inc., respectfully requests this Court enter judgment in its favor and award damages as follows:

1. For the amount of all covered benefits owed under the Policy;

2. For attorneys' fees, court costs and two times the amount of all covered benefits that Defendant unreasonably delayed and denied, as permitted by C.R.S. § 10-3-1116(1);

3. For pre- and post-judgment interest, as permitted by law; and

4. For such other and further relief as this Court may deem just.

**PLAINTIFF DEMANDS A TRIAL BY JURY ON ALL ISSUES SO TRIABLE**

Respectfully submitted this 18th day of December 2020.

                                            *s/ Rodney J. Monheit*
                                            Rodney J. Monheit, Esq.
                                            Katherine E. Goodrich, Esq.
                                            MoGo LLC
                                            2701 Lawrence St., Ste. 113
                                            Denver, CO 80205
                                            Tel: (303) 357-1317
                                            rodney@mogollc.com
                                            katie@mogollc.com
                                            *Attorneys for Park Rise*
                                            *Homeowners Association, Inc.*

Plaintiff's Address:
1499 W. 121st Ave. #100
Westminster, CO 80234